**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**LESLIE M. HARRELL,**

      **Plaintiff,**

**vs.**                          **Case No.  4:11-CV-00493-CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/

## <u>MEMORANDUM OPINION AND ORDER</u>

This is a Social Security case referred to the undersigned United States Magistrate Judge upon consent of the parties and reference by District Judge Stephan P. Mickle.  Doc. 9.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire Record, the decision of the Commissioner is reversed and remanded for further proceedings.

## I.  Procedural status of the case

On July 31, 2008, Plaintiff, Leslie M. Harrell, filed a Title II application for disability and Disability Insurance Benefits (DIB).  On August 1, 2008, Plaintiff filed a Title XVI application for Supplemental Security Income (SSI).  Both applications allege disability beginning November 16, 2003.  R. 21, 151-60, 257; *see infra* n.3.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  Plaintiff's date last insured for the purposes of DIB only, or the date

by which her disability must have commenced in order to receive benefits under Title II only, was December 31, 2007.  R. 38, 161.

Plaintiff's applications were denied initially on January 29, 2009, and upon reconsideration on June 17, 2009.  *Id.* at 21, 78-89, 94-99.  On July 6, 2009, Plaintiff filed a request for hearing.  *Id.* at 21, 100-01.  On August 24, 2010, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Brendan Flanagan in Tallahassee, Florida.  Robert N. Strader, an impartial vocational expert, testified during the hearing.  *Id.* at 71-75.  Plaintiff was represented by James A. Kole, an attorney.  *Id.* at 13-14, 35, 37.

On September 23, 2010, the ALJ issued a Decision denying Plaintiff's applications for benefits.  *Id.* at 21-29.  Plaintiff filed a request for review and submitted a two-page letter and attached a one-sentence statement from David Keen, M.D., one of Plaintiff's treating physicians: "It is medically necessary for Ms. Leslie Harrell to elevate her leg at waist or chair level during a normal work day."  *Id.* at 11-17, 273-75, 391.

On July 25, 2011, the Appeals Council, having considered Plaintiff's post-hearing submission, *id.* at 2, denied Plaintiff's request for review.  *Id.* at 1-5.  The Appeals Council also considered that Plaintiff was "found to be under a disability beginning October 7, 2010, based on the application [Plaintiff] filed on October 7, 2010," but further found that this information did not warrant a change in the ALJ's decision.  *Id.* at 2.  This appeal followed.  *Id.* at 11-13.  The parties filed memoranda of law, docs. 14 and 18, and those have been considered.

## II.  Findings of the ALJ

In the written Decision, the ALJ made several findings relative to the issues

raised in this appeal:

1.  Plaintiff was born on March 23, 1972, and was 31 years of age as of the onset date (November 16, 2003).  Plaintiff has at least a high school education and is able to communicate in English.  R. 28.

2.  Plaintiff has not engaged in substantial gainful activity from her alleged onset date of November 16, 2003, through her date last insured of December 31, 2007.  *Id.* at 23.

3.  Plaintiff has several severe impairments: "history of chronic obstructive pulmonary disease (COPD) and chronic edema of the right leg."  Plaintiff also has the non-severe medically determinable physical impairment of obesity and sleep apnea, that is, "they do not significantly limit the [Plaintiff's] ability to perform basic work activities" and the medially determinable mental impairment of depression that "does not cause more than minimal limitation in the [Plaintiff's] ability to perform basic mental work activities and is therefore non-severe."  *Id.* at 24.

4.  Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*

5.  Plaintiff has the residual functional capacity (RFC) "to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  In reaching this conclusion, the [ALJ] gave special attention to the issue of the [Plaintiff's] obesity as it is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity."  *Id.* at 25.

6.  Plaintiff "is unable to perform any past relevant work."  *Id.* at 28.

7.  Transferability of jobs is not material to the determination of disability.  *Id.*

8.  "Considering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform," that are sedentary and semi-skilled jobs, such as receptionist; shipping and receiving clerk; and cashier.  *Id.* at 28-29.

### III.  Legal Standards Guiding Judicial Review

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002)(citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  Bloodsworth, 703 F.2d at 1240 (citations omitted).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he is under a disability prior to the expiration of his insured status.  *See* 42 U.S.C. § 423(a)(1)(A) and (d); <u>Torres v. Sec'y of Health & Human Servs.</u>, 845 F.2d 1136, 1137-38 (1st Cir. 1988); <u>Cruz Rivera v. Sec'y of Health & Human Servs.</u>, 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v):

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairments?

3.  Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.  Does the individual have any impairments which prevent past relevant work?

5.  Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.  If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e) & (g); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or

from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d at 1440; Edwards, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.

*See* Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir.

1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is

critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.

*See* Wilson, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective

testimony requires as a matter of law, that the testimony be accepted as true.  *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that

only a mental health professional may express an opinion as to the effects of pain.  One

begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other
> symptoms, the claimant must satisfy two parts of a three-part test
> showing:  (1) evidence of an underlying medical condition; and (2) either
> (a) objective medical evidence confirming the severity of the alleged pain;
> or (b) that the objectively determined medical condition can reasonably be
> expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R § 404.1529; 20 C.F.R § 416.929 (explaining

how symptoms and pain are evaluated); 20 C.F.R. § 404.1545(e); 20 C.F.R.

§ 416.945(e) (regarding RFC, total limiting effects).  This is guidance for the way the

ALJ is to evaluate the claimant's subjective pain testimony because it is the medical

model, a template for a treating physician's evaluation of the patient's experience of

pain.  Who else is better able to determine the existence of an underlying medical

condition that can reasonably be expected to give rise to the claimed pain than the

treating physician?  That is why it is so well-established that the treating physician's

opinion as to the existence and effects of pain must be given substantial weight.  *See,*

*e.g.,* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that opinion of

treating physician that claimant suffers from disabling pain must be accepted as true).

It is true that an ALJ may credit subjective pain testimony even if objective evidence is lacking.  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

## IV. Evidence from the Administrative Hearing

### A. Introduction

At the outset of the hearing, Plaintiff's counsel argued Plaintiff would be incapable of working based upon COPD and swelling in her right lower extremity.  As a result of the latter, counsel, relying on exhibit 4F, stated Plaintiff was instructed to keep her leg elevated.[2]  *Id.* at 40.

The ALJ inquired whether argument would be made regarding whether Plaintiff met a specific listing or just less than sedentary and counsel responded "less than sedentary, just because [he thought] what we're dealing with is somewhat unknown, so [he did not] know that if it fits particularly well … in any one area."  After "particularly well," the ALJ stated "[r]ight.  *Id.* at 41.

_____

[2]  Exhibit 4F is a two-page, general vascular intake patient note, authored by ARNP Amy Johnston (and signed by Dr. Brumberg) dated July 21, 2008, stating in part: "Discussed the importance of leg elevation, compression, and walking/weight loss."  *Id.* at 320.

### B.  Leslie M. Harrell (Plaintiff)

Ms. Harrell lives in Crawfordville, Florida, in a three-bedroom detached home that is accessible in the front by three steps and no ramp or railing. *Id.* at 42.  She lives with her 13-year-old child and her fiancé. *Id.*  She is 5'3" tall and weighs 310 pounds. *Id.* at 45-46. *See id.* at 249-56 (Plaintiff's April 10, 2009, function report).

Ms. Harrell graduated from high school in 1991 and attended Keiser College in 1996. *Id.* at 43-44.  She finished the core part of the program (as a medical assistant) but did not complete it. *Id.* at 44.  She had a certification as a nursing assistant that expired.  She can read and write and is able to count change when purchasing merchandise in a store. *Id.*

She has a driver's license but last had access to a vehicle in February 2010. *Id.* at 44-45.  "Actually, [she] didn't drive after October of '08." *Id.* at 45.  Since October 2008, Ms. Harrell has not taken any trips where she was a passenger, although someone drove her to the hearing from Crawfordville. *Id.*

Ms. Harrell smokes about a half a pack of cigarettes a day, reduced about a month ago from about a pack and a half a day, which continued for about six years. *Id.* at 46.  She does not drink alcohol and has never used illegal drugs. *Id.*

Ms. Harrell uses a walker (prescribed by a doctor in 2008 when she was in the hospital and undergoing rehabilitation) when outside her house, but not when she is inside her house where she mostly uses the walls for support. *Id.* at 47.  Her fiancé helps her get up and down the stairs into her house. *Id.*

Ms. Harrell discussed her prior jobs that included working at home health care and at a nursing and rehabilitation facility. *Id.* at 48, 161-78 (earnings report), 234-41

(Plaintiff's work history report).  From 1995 through 1997, Ms. Harrell worked for the

state of Florida, Department of Motor Vehicles, as a full-time research clerk.  She

worked for Wal-Mart in 1998 and 1999.  In 2000, Ms. Harrell worked for Wakulla County

in an unknown capacity and earned $2,931.55. *Id.* at 48, 179.  She worked for the DOS

of Eden Springs LLC 2001 until 2004, Oppenheim Research Inc., briefly in 2004, and

Interim Healthcare of Northwest in 2005, which was her last job.  *Id.* at 48, 179.

Ms. Harrell last applied for several jobs in or about June or July of 2008.  *Id.* at

49.  There were a few reception jobs in Wakulla County and a couple in Tallahassee.

She did not interview for any of these jobs.  *Id.* at 49, 68.

She believes that she could have done the receptionist job until August 2008.  *Id.*

at 68-69.  It was not until August 2008 when her right leg became such a problem that

she was hospitalized and could not work.  *Id.* at 69.  Ms. Harrell applied for DIB on July

31, 2008, and SSI benefits on August 1, 2008.  *Id.* at 21, 69-70.[3]

She receives food stamps and receives income from AFDC for her daughter.  *Id.*

Ms. Harrell described the things she has done over the past four years.  *Id.* at 50.

In the past year, she has done nothing including cleaning, except to keep her leg up.

Prior to this past year, she would make a bed and vacuuming the floor--nothing real

---

[3]  At this point in the hearing, Ms. Harrell's counsel stated: "it would sound like
we've got a problem with the date last insured, but she would still have a viable SSI
claim with, with an onset date that was equal to the protective filing date."  *Id.* at 69-70;
75-76.  (For Title XVI or SSI cases, generally, "[o]nset will be established as of the date
of filing provided the individual was disabled on that date."  SSR 83-20.)  An August 1,
2008, "Disability Report" sets forth Plaintiff's alleged onset date of November 16, 2003,
but also states a "[p]otential [o]nset [d]ate (if different from above)" of August 1, 2008,
"DI."  *Id.* at 182.  Another report of August 4, 2008, from L. Garrison, recommends an
onset date of November 16, 2003, because all earnings after the alleged onset date are
under "SGA and is considered UWA."  *Id.* at 194; *see id.* at 179.  "[T]he claimant must
establish disability on or before [the date last insured on December 31, 2007] in order to
be entitled to a period of disability and disability insurance benefits."  *Id.* at 21.

heavy or strenuous.  She makes meals and can prepare food for herself such as a sandwich.  Her daughter helps a lot.  *Id.*  She has done no vacuuming over the past year.  *Id.* at 54.

She initially stated that she does not wash dishes after eating, but then stated that she can as long as she does not have to stand too long such as 20 to 30 minutes.  Thereafter, she has to sit down and prop her leg up for about an hour before she could stand up again for another 20 to 30 minutes.  When she stands up, she can use the walls and get into the kitchen rather than use a walker.  *Id.* at 51-52.

She could put her clothes on, but her fiancé helps "a little bit," including helping her in and out of the shower.  She can shampoo her hair and brush her teeth.  *Id.* at 51.  She stands up when showering.  *Id.* at 67.

About twice a week, Ms. Harrell walks for about 30 minutes outside and around her house and without a walker as long as she can hold on to her fiancé.  *Id.* at 53.  Sometimes she can walk without holding onto him; it depends.  *Id.* at 52-53.

She uses a CPAP every night.  *Id.* at 54, 59.  She usually goes to bed at night somewhere between 10 and 11 p.m., *id.* at 54, and her morning usually begins at 6:00 a.m. when she gets her daughter up and ready for school.  Her daughter normally fixes her own breakfast.  After her daughter gets on the bus for school, Ms. Harrell goes back to bed and sleeps three or four hours.  *Id.* at 55-56.

On a typical day, after returning to sleep in the morning, she will check her blood sugar, get something to eat (between 11 a.m. and noon), take her medicine, and sit in a recliner and prop her leg up.  When her daughter gets home from school, if she needs

help with her homework, she will help her. *Id.* at 56. While sitting in the recliner, she usually watches television or sleeps. *Id.*

Ms. Harrell reads romance novels, thrillers, and mysteries and can read a good Grisham book for about an hour. *Id.* at 56-57. She does not use a computer or have any hobbies such as sewing except to fix a button. Occasionally, she plays cards. *Id.* at 57. Ms. Harrell goes to the grocery store and uses an electric cart and has done so since 2008. *Id.* at 57-58. She has not participated in her daughter's activities at school lately or even last school year. *Id.* at 54. Ms. Harrell last did laundry "[m]aybe a year ago." *Id.*

Ms. Harrell takes several drugs including Metformin for diabetes; Simvastatin for cholesterol; and Percocet for pain, perhaps twice a month when on her feet. *Id.* at 58-59. She uses an inhaler twice a day. *Id.* at 59; *see id.* at 266, 272 (medications).

Ms. Harrell's right leg was swollen from the right knee down after the drive from Crawfordville to Tallahassee to attend the hearing. *Id.* at 60. (Prior to driving to Tallahassee for the hearing, her right leg was normal for her. *Id.* at 67. It took about 15 minutes to swell after she arrived at the hearing. *Id.*) At hearing, her right ankle was approximately 21 inches and more than 22 inches at the calf. Her left ankle measured about 15 inches. *Id.* at 64. Normally, her right leg does not get that big because she tries to stay off her feet. *Id.* at 66. When Ms. Harrell arises in the morning from sleep, her right leg is still bigger than her left. *Id.* at 65. Even on the best day, if not vigilant on keeping her leg elevated, her right foot will swell. *Id.* at 66.

Over the past month prior to the hearing and out of a 24-hour day, she has her foot elevated above her heart for about 23 hours. *Id.* at 67.

She does not currently take medication for the swelling, although she was given Lasix in 2008 (and stopped in 2009) that did not work.  *Id.* at 61.  No diagnosis has been made of the swelling, but "[t]hey are leaning towards lymphedema."  *Id.*

The swelling in her leg "mostly" prevents her from working as she has to keep her leg "elevated above [her] heart."  *Id.* at 61.  She cannot walk too far or she cannot catch her breath.  *Id.*  When swollen, her leg is painful and it hurts.  If she keeps her right leg down for more than 30 minutes to an hour, it swells and is "stinging."  *Id.* at 62, 66.  If not swelling, her pain level is "[n]ormally, about a two," on a one to ten scale.  *Id.*

Her leg would need to be elevated above her heart for Ms. Harrell to work throughout an eight-hour day, stand for a total of two hours, and after that, then sit down.  *Id.* at 63.

When hospitalized in 2008, Ms. Harrell did physical and occupational therapy that included walking in a circle using a walker; leg raises; using pedals on a bicycle; and putting puzzles together.  *Id.* at 70.  Doctors have discussed with Ms. Harrell the need for weight loss and walking.  *Id.* at 70-71.

### C.  Robert N. Strader (vocational expert)

Mr. Strader testified, without objection, as an impartial vocational expert.  *Id.* at 21, 71-72, 144 (Resume).  He agreed to advise the ALJ if he gave an opinion that conflicted with the Dictionary of Titles (DOT).  *Id.* at 71.

Mr. Strader reviewed Plaintiff's past work history: nurse's assistant (medium category and semi-skilled with a SVP of 4); cashier/checker (light category and semi-skilled with a SVP of 3); researcher of vehicle titles (no specific DOT, maybe classified as general clerk (light category and semi-skilled with a SVP of 3)).  *Id.* at 28, 72.

The ALJ and Mr. Strader had the following colloquy:

Q: And let me have you assume the claimant has a [RFC] to perform sedentary work, that is, lift or carry up to 10 pounds, and stand or walk two hours, and sit six hours in an eight-hour workday, with unlimited push/pull capability.  And with these additional limits, would occasionally climb ramps or stairs, and occasionally balance, stoop, kneel, crouch, and crawl; and would never climb ladders, ropes or scaffolds; would avoid hazards and pulmonary irritants: fumes, odors, dust, gasses.  Assuming these limitations, can the claimant perform any of her past work?

A: No, Your Honor.

Q: And assume that a hypothetical individual with the same work experience you've described, and the same age and education as the claimant, which are a younger individual and high school or more education, and assume that the hypothetical individual is capable of working with the functional limitations I just described.  Are there other jobs that the hypothetical individual could perform in the regional or national economy?

A: Mostly sedentary jobs would conform to that, Your Honor, and I could give you several of them.

Q: Okay.

Mr. Strader described three jobs that such an individual could perform: sedentary receptionist; sedentary cashier; and sedentary shipping and receiving clerk.  These jobs are semi-skilled.  *Id.* at 28-29, 73.

The ALJ added to the hypothetical: "if everything were the same, but, but when sitting, that the claimant had to have the, the leg elevated to waist level, would, would the claimant be able to perform any of those jobs, or would there be a diminishment, a reduction in any of those jobs?"  Mr. Strader responded that "[s]he would be unemployable at that stage," that is, Ms. Harrell would be unemployable if she is required to raise her leg to waist level or the same level as "the chair," as opposed to using "a little footstool."  *Id.* at 73-74.  For Mr. Strader, "the main crux is that elevation to the leg."  At that level, Ms. Harrell "would just be unemployable."  *Id.* at 74-75.

Mr. Strader considered Ms. Harrell's use of a walker to get to a job.  However, if Ms. Harrell needed to use a walker at a job, and the original RFC of sedentary and other limitations are considered, "at least 90 percent" of the sedentary jobs discussed above would be eliminated.  (The ALJ adopted this opinion stating: "The vocational expert further testified that if a walker was medically necessary to move about, the number of each of the above jobs would be reduced by about 90%."  *Id.* at 29.)  There were no follow-up questions from Plaintiff's counsel.  *Id.* at 75.

Ms. Harrell's counsel provided the following closing argument:

> You know, again, I just think that at least as of the protective filing date [August 1, 2008] pursuant to the Supplemental Security Income claim, the claimant would have been incapable of performing even sedentary work due to the, the swelling of the right lower extremity, the cellulitis, I guess, is one of the things that they're calling it.  Again, this is the sort of thing that, you know, there probably should be a listing, but there's not, when someone has this amount of the edema in an extremity that requires, you know, this sort of elevation.  But there's not.  I mean, we, we have no choice but to go to less than sedentary, and I think the claimant was very forthcoming, and said, yeah, up until the protective filing date, I probably could have maybe done something, but not, not as of that point.  And the presentation today is, is remarkable.

*Id.* at 75-76; *see supra* n.3.

### D.  Medical Evidence that Pre- and Post-dates November 16, 2003 (Alleged Onset Date)

Plaintiff was previously diagnosed in 1997 with significant obstructive sleep apnea/hypopnea syndrome.  She was retested in August 2006, and it was noted the symptoms were incompletely resolved with CPAP treatment.  R. 280; *see id* at 296-301.

In October 2006, Plaintiff was examined by David Y. Huang, M.D., Tallahassee Pulmonary Clinic.  *Id.* at 288.  Plaintiff's weight gain, poor sleep habits, and ongoing difficulty with CPAP treatment was noted.  At that time, however, Plaintiff was also

documented to be taking Lasix, a diuretic, and had shortness of breath after walking 100 feet.  Plaintiff was noted to be 63 inches tall and 326 pounds, with a Body Mass Index of 57.  Recommendations included weight loss.  *Id.* at 288-89.  Increase in CPAP pressure was prescribed, in addition to a weight loss and smoking cessation recommendation being made and a trial of Prozac.  *Id.* at 290.

On May 16, 2007, Plaintiff reported right leg pain and swelling, with a bad reaction to the diuretic Lasix.  A different diuretic was prescribed.  *Id.* at 396.

On July 11, 2007, Plaintiff saw Dr. Keen for significant anxiety. He noted vocational rehabilitation would be contacted for weight loss surgery.  *Id.* at 395.

On November 28, 2007, Plaintiff saw Dr. Keen's nurse to discuss weight loss. She weighed 308 pounds, and had to weigh less than 300 pounds for gastric bypass surgery.  Plaintiff explained that walking 30 minutes a day caused her shortness of breath, so she was told to try walking 15 minutes daily for weight loss.  *Id.* at 389.

On December 6, 2007, Plaintiff's active problems with obesity and sleep apnea were noted and Plaintiff received a trigger point injection for left knee pain.  *Id.* at 387-88.

On April 7, 2008, Plaintiff sought treatment for right knee pain with her "leg bother[ing her] some."  Dr. Keen noted decreased range of motion secondary to discomfort and anatomy, in addition to 1+ pedal edema of the leg.  *Id.* at 378.

On April 23, 2008, Plaintiff was seen for 4+ edema of the right leg and right knee pain, and was diagnosed with "severe pedal edema" and erythema or redness of the skin.  *Id.* at 376.  Although Plaintiff took a double dose of the diuretic, she still did not have any diuresis.  Plaintiff was noted to have low oxygen saturation and some

wheezing although she denied shortness of breath.  Her blood pressure was normal.

Plaintiff also complained of right knee pain, but it was "difficult to tell whether she has a

positive Homans sign."  *Id.* at 377.

An April 25, 2008, venous Doppler study of the right leg was normal,

notwithstanding "[r]ight leg swelling."  *Id.* at 375.  On May 7, 2008, Plaintiff reported right

knee pain and right leg swelling.  It appears Dr. Keen suspected the swelling was due to

cellulitis and prescribed Cipro antibiotics and Lasix diuretic.  *Id.* at 374.

On May 15, 2008, Plaintiff complained of right leg edema, and Dr. Keen

confirmed the left leg was swollen, but the right leg was much larger.  *Id.* at 373.

A May 29, 2008, CT angiogram of the bilateral lower extremities was negative;

however, there was "nonspecific soft tissue swelling" bilaterally, especially in the calves,

but worse on the right, associated with moderate adenopathy in the inguinal region.  *Id.*

at 315-16.

On June 12, 2008, Plaintiff reported pain and swelling that was keeping her

awake, and did not improve with leg elevation.  Dr. Keen confirmed the right leg was

swollen and tender, and recommended a surgical consultation.  *Id.* at 372.

On July 21, 2008, Plaintiff was examined by ARNP Johnston (and the patient

note was signed by vascular surgeon Dr. Brumberg).  *See supra* n.2.  ARNP Johnston

noted Plaintiff's swelling started in early April with a fairly sudden onset, but also noted it

"is and has always been worse on the right."  *Id.* at 319.  Aortic pulses were not

palpable, and Plaintiff had 3+ edema on the right and 2+ edema on the left, which he

found was "characteristic of lymphedema."  Further assessment was necessary, and the

"importance of leg elevation, compression, and walking/weight loss" was discussed with Plaintiff.  *Id.* at 320.

On August 13, 2008, Plaintiff reported ongoing swelling and pain in both legs, with right leg tenderness.  Dr. Keen noted Plaintiff was also morbidly obese, which complicated her condition, in addition to smoking.  He noted Plaintiff wanted to quit smoking.  *Id.* at 371.

On August 15, 2008, Plaintiff was examined by surgeon Katherine E. Langston, M.D., who found bilateral lower extremity swelling, right significantly more than the left. Although the swelling was noted to be "new-onset," Dr. Langston also noted a "long history of lower extremity edema."  Moderate inguinal adenopathy and retroperitoneal lymph notes were noted, and Plaintiff was scheduled for a right inguinal lymph node biopsy.  *Id.* at 532.

On August 19, 2008, Plaintiff sought hospital treatment for shortness of breath; however, chronic edema and changes of the right leg were also noted.  *Id.* at 359-60.

On August 27, 2008, Dr. Keen noted continuing "remarkable lymphedema in the right lower extremity" for which the biopsy was ordered.  *Id.* at 368.

Plaintiff was hospitalized from September 12 through 23, 2008, for a right groin abscess and lymphocele.  *Id.* at 405-08, 413-15.

Plaintiff was again hospitalized from October 10 through 22, 2008, after increasing swelling and pain in the right leg, which was even worse with unbearable pain in the prior week.  Plaintiff reported sleeping in a recliner, bilateral lower extremity edema, headache, and shortness of breath.  *Id.* at 416.  Upon examination, the right leg was more swollen than the left leg with erythema, or discoloration, and was tender to

palpation.  Cellulitis was also noted, with lymphedema considered a possible diagnosis.
The left leg was also swollen with trace pedal edema.  *Id.* at 417-18.  The right leg
swelling reduced with intravenous antibiotics and a leg wrap.  Plaintiff was instructed to
ambulate as much as possible, but reported she could not walk much due to pain.  *Id.* at
419.  An ultrasound Doppler of the right lower extremity was negative for DVT and only
subcutaneous tissue of the right lower leg with cellulitis with an enlarged right inguinal
lymph node that could be reactive was noted.  *Id.*

Plaintiff was discharged to the HealthSouth Rehabilitation Hospital of
Tallahassee for twice daily physical and occupational therapy "all aimed at improving
functional mobility and [activities of daily living] function in order to get the patient safely
home."  *Id.* at 420, 440, 442.  Orders at admission to therapy stated: "elevate legs when
sitting."  *Id.* at 451.  At discharge, despite Plaintiff's improved condition, edema and
redness were still present.  Plaintiff's attending physician, Dr. Rowland, opined,
"[u]nfortunately, due to her size, I am concerned that this is going to be an ongoing
chronic problem" and noted she had "multifactorial debility and now debilitating cellulitis
in the right lower extremity."  *Id.* at 442, 445, 452.  A front-wheeled rolling walker with
five-inch wheels and glide tips was provided at discharge.  *Id.* at 445.

After discharge, but during therapy, on October 24, 2008, Plaintiff was observed
to have increased swelling, redness, and pain of the leg.  *Id.* at 454.  By October 29,
2008, the redness was improved, but still "orange peel" like in appearance.  It was also
noted that this would likely be an ongoing problem due to Plaintiff's weight.  *Id.* at 456.

On November 6, 2008, Plaintiff saw Dr. Keen, who observed Plaintiff's legs were
still swollen, right greater than left.  *Id.* at 513.

On November 24, 2008, Plaintiff was examined by Wayne Sampson, M.D. at the Commissioner's request.  She reported the swelling did not resolve with diuretics, but resolves with elevation.  The swelling and pain returned after being upright for more than 30 minute, however.  Plaintiff reported using a scooter to do her grocery shopping and doing light chores around her home.  *Id.* at 460.  Upon examination, Dr. Sampson noted non-pitting edema, hyperpigmentation of the legs, right greater than left; and a rough, firm consistency of the lower half of the right leg.  *Id.* at 461.  Dr. Sampson diagnosed chronic edema with venous stasis changes, right leg; morbid obesity; and a history of sleep apnea and COPD.  *Id.* at 462.

On December 22, 2008, Plaintiff again asked Dr. Keen about weight loss surgery, but had increased her smoking.  *Id.* at 514.

On January 23, 2009, pulmonary function testing was performed, apparently at the Commissioner's request.  Plaintiff was noted to tire easily in the premedication testing.  Results appeared to demonstrate pulmonary insufficiency.  *Id.* at 468.

On February 27, 2009, Plaintiff again requested a referral for weight loss surgery, and Dr. Keen observed marked swelling and edema of the right leg, and a swollen left leg.  *Id.* at 515.

On April 15, 2009, Dr. Keen prescribed permanent oxygen for use while sleeping.  *Id.* at 517-18.

On June 5, 2009, Dr. Keen noted Plaintiff's history of lymphedema with ongoing pedal edema and chronic pain. He opined she had "remarkable lymphedema on the right lower extremity," but testing was normal and diuretics were not helpful.  Ultram was refilled for pain, and Plaintiff was referred for further consultation.  *Id.* at 523.

A June 11, 2009, knee X-ray demonstrated mild degenerative changes and small tricompartmental osteophytes in both knees with no evidence of fracture or effusion. *Id.* at 497.

On June 16, 2009, a non-examining State agency physician Edmund Molis, M.D., opined that Plaintiff could lift 10 pounds frequently, 20 pounds occasionally, but was limited to standing or walking two hours daily and could sit six hours daily. *Id.* at 498-505. He noted the Dr. Sampson's examination showed "brawny edema" and found Plaintiff's "mobility is severely impaired by morbid obesity and extensive edema of the [right lower extremity, greater than the left lower extremity]" and the allegations were credible and consistent with medical evidence. He also noted, however, there was no treating or examining source statement regarding limitations in the file at the time of review. *Id.* at 499-504. Internal agency documents contain an additional explanation from Dr. Molis: "although the CE vendor [Dr. Sampson] stated that she had 'brawny edema' involving the 'lower half' of her leg, which would give her a listing level impairment on a technicality (4.11A), which only requires involvement of the distal one third of the leg … we felt that in view of her ability to stand and walk unassisted, with a negative venous Doppler study and negative CT angiogram of the leg, she should be able to perform [substantial gainful activity] at at least a sedentary level." *Id.* at 509.

On June 24, 2009, at 10:00 a.m., Dr. Keen noted Plaintiff's bilateral leg pain, right worse than left, and increased swelling of the right leg. He noted the right leg was now 1.5 times the size of the left leg, and she was not sleeping well due to the right leg issues. He described the right leg as "ballooned out" and drew a picture. *Id.* at 519.

The State agency physical RFC assessment dated January 28, 2009, and labeled as exhibit 14F, was completed by a single decision maker, not a medical consultant.  *Id.* at 469-76.

On September 2, 2009, Plaintiff told Dr. Keen the right leg swelling and pain was worse, and Darvocet did not work.  Upon examination, Dr. Keen confirmed increased swelling with the right leg twice the size of the left leg.  He diagnosed right leg lymphedema.  *Id.* at 524.

Plaintiff again sought hospital care on June 20, 2010, due to lower extremity pain, swelling, and redness in both lower extremities and the right lower extremity twice the size of the left.  *Id.* at 565, 569-85.

A June 21, 2010, venous Doppler study was normal, although the study was limited due to right lower leg edema.  *Id.* at 562.

Plaintiff was again hospitalized on an emergency basis from June 28 through 30, 2010, for right lower extremity cellulitis, in addition to severe right lower extremity lymphedema, after worsening redness and pain.  Plaintiff was noted to have a baseline of a chronically swollen right lower extremity, and although that was better in the amount of swelling, she had redness extending up to her knee.  Upon examination, the edema was noted to be mainly non-pitting bilaterally, and was much more pronounced on the right calf and lower extremity as compared to the left.  The attending physician noted right lower extremity cellulitis and chronic lower extremity edema were the working diagnoses, and Plaintiff had failed outpatient oral antibiotics and her condition was worsening.  A CT scan of the right lower leg noted extensive edema throughout the lower leg right side, obscuring the soft tissue and with the edema possibly more

pronounced at the mid lower third of the leg.  Significant thickening of the skin was also noted.  *Id.* at 534-48.

The administrative hearing was held on August 24, 2010.

## V.  Legal Analysis

The following issues are implicated in or raised in this appeal: whether the November 16, 2003, alleged onset date is relevant; whether the ALJ erred at step three when concluding that Plaintiff's impairments did not meet or equal Listing 4.11A; whether the ALJ erred in rejecting the opinions of Plaintiff's treating physicians and not crediting Plaintiff's subjective complaints that are impacting her ability to work because she needs to elevate her right leg to such an extent as to render her unable to work an eight-hour day; and whether the ALJ erred in finding that Ms. Harrell had the RFC to perform sedentary jobs.

The arguments of the parties have been carefully considered.  After reviewing the entire Record, this case is reversed and remanded to the Commissioner for further proceedings.

## A.  The Alleged Onset Date and Plaintiff's Credibility in Light of Medical Evidence

### 1.  The On-Set Date

The ALJ summarized the record evidence, including part of Plaintiff's hearing testimony regarding her use of a walker (received in 2008 as part of her rehabilitation) outside her house, and the fact that she applied for several reception jobs in June or July 2008 but did not get an interview.  R. 26-27.  The ALJ made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 27.[4]

After this general credibility finding, the ALJ found Plaintiff to be "less than fully credible" in light of the summarized medical and other reports as well as Plaintiff's hearing testimony that he found to have diminished her credibility as follows:

> The claimant testified she applied for several jobs after her alleged date of onset. The application for such jobs required the claimant to hold herself out as able to work, which is inconsistent with her allegation of disability since November 16, 2003. The claimant also testified that she takes walks for 30 minutes and can stand for 20-30 minutes. She is able to perform all self-care, can prepare simple meals, reads mystery novels and plays cards. She wakes her teenage daughter for school and helps her with homework.

*Id.*[5]

Plaintiff filed two applications: one (filed July 31, 2008) requesting consideration for a period of disability and Disability Insurance Benefits and the other (filed August 1, 2008) requesting Supplemental Security Income. R. 21. To establish entitlement to disability benefits, Plaintiff must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which can be

---

[4] This statement or variations thereof appears to be common. *See, e.g.*, Lowery v. Astrue, No. 4:08cv323-MP/WCS, 2009 U.S. Dist. LEXIS 42590, at *48-49 (N.D. Fla. Apr. 13, 2009); Mai v. Astrue, No. 8:07cv288-T/TGW, 2008 U.S. Dist. LEXIS 10382, at *7 (M.D. Feb. 11, 2008). This statement alone is inadequate to justify the ALJ's discounting of the Plaintiff's subjective complaints. Cannon v. Bowen, 858 F.2d 1541, 1545 (11th Cir. 1988).

[5] Plaintiff testified that about twice a week she walks for about 30 minutes outside and around her house and without a walker as long as she can hold onto her fiancé. *Id.* at 52-53. She can wash dishes as long as she does not stand too long such as 20 to 30 minutes. Thereafter, she has to sit down and prop her leg up for about an hour before she could stand up again for another 20 to 30 minutes. *Id.* at 51-52.

expected to end in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  Cannon, 858 F.2d at 1544.[6]  As noted by the ALJ, with respect to the Title II claim for a period of disability and DIB, there is an additional issue whether the insured status requirements of the Social Security Act (Act) are met. R. 21; see doc. 14 at 2.  Plaintiff was insured through December 31, 2007.  Thus, Plaintiff "must establish disability on or before that date in order to be entitled to a period of disability and [DIB]."  Id. at 21; see supra n.3.  See also SSR 83-20: Titles II and XVI: Onset of Disability.

The ALJ found that as of December 31, 2007, the date Plaintiff was last insured, Plaintiff had two severe impairments: history of chronic obstructive pulmonary disease (COPD) and chronic edema of the right leg.  Id. at 23.  The ALJ also found that Plaintiff has not engaged in substantial gainful activity (SGA) since November 16, 2003.  Id.; see supra n.3.

In her memorandum, Plaintiff herself questions the relevance of the November 16, 2003, date in the context of the ALJ questioning Plaintiff's credibility, in part, because she applied for jobs during the summer of 2008, "after her alleged date of onset."  Id. at 27; doc. 14 at 17 ("Indeed, Plaintiff continued to work through 2005, and did not apply for benefits until July 2008.  Therefore, the relevance of the 2003 date is unclear.").  Plaintiff requests this case be remanded "with instructions to deem Plaintiff disabled as of her last date insured."  Doc. 14 at 18.  In footnote four of her

---

[6]  See generally Gonzalez v. Bowen, 715 F. Supp. 412 (D.P.R. 1988)(remanding case with instructions to evaluate, and if necessary develop, such evidence together with other evidence at hand and conclude whether or to what extent the claimant was able to engage in substantial gainful activity from the onset date to the date when insurance expired), appeal after remand, 757 F. Supp. 130 (D.P.R. 1991).

memorandum, Plaintiff "agrees to an amended onset date of December 30, 2007, the day prior to the date last insured, to expedite the resolution of this matter." *Id.*

During the administrative hearing, Plaintiff's counsel recognized that Plaintiff's application for DIB (not the SSI application) was a problem given the date late insured of December 31, 2007, in light of Plaintiff's testimony that she applied for jobs and could have done the receptionist job until August 2008 when she was hospitalized. *Id.* at 68-69; *see supra* n.3. During a brief closing argument, counsel reiterated, for the purpose of Plaintiff's SSI claim, that Plaintiff "would have been incapable of performing even sedentary work due to the, the swelling of the right lower extremity," impliedly reiterating the prior concern with Plaintiff's DIB claim. *Id.* at 75-76. (For Title XVI or SSI cases, generally, "[o]nset will be established as of the date of filing provided the individual was disabled on that date." SSR 83-20.)

Substantial evidence supports the ALJ's finding that Plaintiff has not engaged in substantial gainful employment since November 16, 2003, and that she meets the insured status requirements of the Act through December 31, 2007, two matters not in dispute. Although not directly raised as a point in this appeal, the November 16, 2003, onset date is not supported by substantial evidence. Therefore, the ALJ's basis for rejecting Plaintiff's credibility based in part on her application for several jobs during the summer of 2008 and after her alleged onset date, *id.* at 27, is likewise not supported by substantial evidence.

### 2. Plaintiff's Credibility in Light of Medical Evidence

The ALJ noted repeated reports of swelling of Plaintiff's right leg but found:

Claimant testified that the cause of her leg swelling has not been found and the medical record notes that claimant denied any pain. (Exhibit 4F/2). The swelling

was not caused by injury or disease.  (Exhibit 4F/2).  Venous doppler testing was reported as benign, deep vein thrombosis was ruled out, and a diagnosis of lymphadema (sic) was noted as "less likely." (Exhibit 4F/2).  Dr. Ropbert (sic) Brumberg, D.O., reported as follows: "Discussed the importance of leg elevation, compression, and walking/weight loss."  (Exhibit 4F/3).  *The medical record does not discuss the duration of leg elevation or walking.*  (Exhibit 4F/3).

*Id.* at 27 (emphasis added); *see supra* n.2 (July 21, 2008, patient note).

The ALJ gave "great weight" to the opinion evidence (November 24, 2008) of consultative examiner, Dr. Sampson; a consultative study of January 23, 2009; an x-ray report of June 11, 2009; treating records (April 30, 2007, through April 20, 2010) from treating source, Wakulla Urgent Care and Diagnostic Services; and the State agency psychological and medical consultant's RFC and Psychiatric Technique (PRTF) assessments.  *Id.* at 27.

Notwithstanding Plaintiff's severe impairments, the ALJ determined that Plaintiff had the RFC to perform a range of sedentary work, with several limitations.  The ALJ gave special attention to Plaintiff's obesity, *id.* at 25, but rejected Plaintiff's testimony of her need to keep her right leg elevated throughout the day and references in 2008 patient notes reflecting medical observations that Plaintiff keep her leg elevated.

The ALJ's finding that Plaintiff has the severe impairment of "chronic edema of the right leg" is well-documented in the patient records, including but limited to, Dr. Keen's patient records from 2007 forward.

On July 21, 2008, Plaintiff was examined by ARNP Johnston, *id.* at 319-20, and, as noted by the ALJ, *id.* at 27, Dr. Brumberg reported as follows: "Discussed the importance of leg elevation compression, and walking/weight loss."  *Id.* at 320.

Plaintiff sought hospital treatment in August 2008 for shortness of breath, although chronic edema and changes of the right leg were noted.  *Id.* at 368.  She was

also hospitalized from September 12 through 23, 2008, for a right groin abscess and lymphocele.  *Id.* at 405-08, 413-15.

Plaintiff was again hospitalized from October 10 through 22, 2008, after experiencing an increase in swelling and pain in the right leg.  *Id.* at 416.  She was instructed to ambulate as much as possible, but reported she could not walk much due to pain.  *Id.* at 419.  Plaintiff was discharged to a rehabilitation hospital and orders at admission to therapy stated: "elevate legs when sitting."  *Id.* at 451.  This was the second record reference to the need for Plaintiff to elevate her legs.  At discharge, Plaintiff was provided with a walker.  *Id.* at 445.

In November 2008, after discharge from therapy, Dr. Keen continued to observe Plaintiff's legs were still swollen, right greater than left.  *Id.* at 513.

On November 24, 2008, Plaintiff was examined by Dr. Sampson at the Commissioner's request.  Plaintiff reported the swelling did not resolve with diuretics, but resolves with elevation.  The swelling and pain returned, however, after being upright for more than 30 minutes.  Plaintiff reported using a scooter at the grocery store. *Id.* at 460.

Dr. Keen continued to note marked swelling and edema of the right leg in 2009 and 2010, including a June 24, 2009, note that indicated Plaintiff's right leg was 1.5 times the size of her left leg.  On this occasion, Dr. Keen drew a picture of Plaintiff's legs, noting the differences in size.  *Id.* at 519; *see* doc 14 at 7 (drawing).

Plaintiff was again hospitalized from June 28 through 30, 2010, for right lower cellulitis, in addition to severe right lower extremity lymphedema, after worsening redness and pain.  *Id.* at 562.

After the close of the administrative hearing, Plaintiff's counsel submitted a letter and a note from Dr. Keen, one of Plaintiff's on-going treating physicians, which stated: "It is medically necessary for Ms. Leslie Harrell to elevate her leg at waist or chair level during a normal work day." *Id.* at 275. It appears the Appeals Council considered this information, but did not find it persuasive to alter the decision of the ALJ. *Id.* at 1-2.

Mr. Strader, a vocational expert, was present at the hearing when Plaintiff testified. After Plaintiff's testimony, the ALJ posed a hypothetical question, *see supra* at 15, which required him to opine whether Plaintiff could perform her past work to which he replied, "No." The ALJ asked Mr. Strader another hypothetical question, *see supra* at 15, and in response, he opined that Plaintiff could perform three sedentary jobs. *Id.* at 72-73.

The ALJ asked Mr. Strader to consider whether there would be a diminishment or reduction in Plaintiff's ability to perform any of the three sedentary jobs if, when sitting, she needed to *elevate her leg to waist level*. Mr. Strader responded that "[s]he would be *unemployable* at that stage" or the same level as the chair as opposed to using "a little footstool." *Id.* at 73-74 (emphasis added). For Mr. Strader, "the main crux is that elevation to the leg" and at "that level [she] would just be unemployable." *Id.* at 75. Mr. Strader also opined that if Plaintiff needed a walker at a job and the original RFC of sedentary and other limitations were considered (without leg elevation), "at least 90 percent" of the three sedentary jobs would be eliminated, *id.* at 75, a point recounted by the ALJ, *id.* at 29.

Based upon the record references (in 2008 and thereafter) of Plaintiff's need to elevate her right leg that are consistent with Plaintiff's hearing testimony, the ALJ erred

in not considering Plaintiff's need to elevate her leg in the RFC finding.  This is particularly troublesome in light of Mr. Strader's opinion that Plaintiff would be "unemployable" if Plaintiff needed to elevate her leg to waist level.

The ALJ (and the Appeals Council) gave legally insufficient reasons for rejecting the opinion of treating physician Dr. Brumberg, and the post-hearing opinion of Dr. Keen (in conjunction with Dr. Keen's on-going treatment of Plaintiff) that Plaintiff needed to elevate her right leg during the day to reduce swelling and by not crediting Plaintiff's need to keep her right leg elevated throughout the day.  These errors led to an erroneous RFC determination that Plaintiff can perform sedentary jobs that is not supported by substantial evidence.  It is unnecessary to consider any remaining issues, including whether benefits should be awarded in this appeal.

On remand, the Commissioner should reconsider the opinions of Drs. Keen and Brumberg as well as other relevant evidence in the record in order to determine Plaintiff's onset date of disability, which apparently Plaintiff concedes, is not November 16, 2003.  The undersigned is reluctant to award benefits effective December 30, 2007, in accordance with Plaintiff's request, *see* doc. 14 at 4, without the Commissioner first determining the appropriate onset date and ultimately whether Plaintiff is disabled at step 3 or step 5 and, if so, when she became disabled.  *See generally* 20 C.F.R. §§ 404.1503(c) and 416.903(c).

## VI.  Conclusion

Considering the Record as a whole, the findings of the ALJ are not based upon substantial evidence in the record and the ALJ incorrectly applied the law.  Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner

to deny Plaintiff's application for Social Security benefits is **REVERSED** and this case is

**REMANDED** for further proceedings consistent with this Memorandum Opinion and

Order.  The Clerk is **DIRECTED** to enter judgment for the Plaintiff.

 **DONE AND ORDERED** at Tallahassee, Florida, on August 1, 2012.


 **s/    Charles A. Stampelos**
 **CHARLES A. STAMPELOS**
 **UNITED STATES MAGISTRATE JUDGE**